Wanda **PHILLIPS**, Plaintiff,

v.

**UNITED BROTHERHOOD OF CARPENTERS AND JOINERS OF AMERICA, Defendant.**

**No. LR–C–83–569.**

United States District Court,
E.D. Arkansas, W.D.

July 13, 1984.

Philip E. Kaplan, Karen Arndt, Little Rock, Ark., for plaintiff.

Tara Levy, Youngdahl & Larrison, Little Rock, Ark., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

ROY, District Judge.

### FINDINGS OF FACT

1. Plaintiff Wanda Phillips is a white female citizen of the United States and a resident of McNeil, Columbia County, Arkansas.

2. Defendant United Brotherhood of Carpenters and Joiners of America, AFL–CIO ("UBC"), is a labor union within the meaning of 29 U.S.C. § 101, *et seq.*, and an employer within the meaning of 42 U.S.C. § 2000e(b).

3. Plaintiff filed a timely charge of sex discrimination with the Equal Employment Opportunity Commission (EEOC) on November 16, 1982, within the statutory one hundred eighty (180) days of her termination, and she brought this lawsuit on July 1, 1983, within the statutory ninety (90) days from receipt of the Notice of Right to Sue from the EEOC.

4. Plaintiff began her employment with the defendant on January 4, 1981, as an organizer. She was assigned to the Southern States Organizing Office in Atlanta, Georgia, to concentrate on union organizing campaigns in Arkansas.

5. During her employment with the defendant, plaintiff was the only female union organizer on the Southern States Organizing Office staff, until January, 1982, when Alice Beck was hired. Defendant had a 70,000 membership loss between 1981 and 1982.

6. Plaintiff had done organizing work for the UBC since mid-1979, when she was involved in organizing employees of the Can-Tex plant in Magnolia, Arkansas, after she was terminated from that plant for union activity. Although the organizing work plaintiff performed from mid-1979 to 1981 consisted of voluntary activities undertaken prior to her employment with defendant, she was reimbursed for her expenses in assisting the defendant, from special vouchers filed through the UBC Southern States. Plaintiff testified that she received $50.00 per week and twenty cents on the mile. During this time, plaintiff assisted Ed Fortson, a white male and a UBC organizer in the Southern States region, on several campaigns in Arkansas.

7. After being hired onto the UBC payroll in January, 1981, plaintiff spoke to then Director of the Southern States Office, W.J. Smith, regarding the terms of her employment with the UBC. James A. Parker, Director of Organization for the General President, subsequently confirmed in a letter dated January 8, 1981, that she would be paid from the Southern States' Temporary Organizers' Revolving Fund, and would be carried on a probationary status for a period of one year, "during which time you will have an opportunity to see if the work is satisfactory to you and we will have an opportunity to assess your progress and development as an Organizer-Representative." Mr. J.B. Smith and plaintiff subsequently agreed that plaintiff would be paid $375.00 a week and $50.00 a day per diem and $10.00 a day for miscellaneous expenses.

8. During the course of her employment, plaintiff participated in two successful organizing campaigns which resulted in successful NLRB elections; one at Falcon Products, Inc., in Lewisville, Arkansas, and the other at Klipsch Associates, Inc., in Hope, Arkansas. Plaintiff had also worked on two successful union campaigns prior to going on to the Revolving Fund payroll in Monticello, Arkansas, at MonArk Boat Company, and at Williamette Industries in Emerson, Arkansas. Because Ed Fortson was gone from the Williamette campaign much of the time, there was a period when plaintiff was working the campaign only with the assistance of a fired employee.

9. In January, 1981, plaintiff was assigned to the International Paper campaign in Gurdon, Arkansas, and was ostensibly placed in charge of that campaign. The campaign formally ended in October, 1984, without an election as a direct result of

large economic layoffs at the plant. W.J. Smith, Director of the Southern States Office, observed plaintiff for one week at the Gurdon plant during June, 1981, and praised her performance on that campaign. Plaintiff received praise on this campaign as late as January, 1982. This favorable comment was confirmed in Earl Hamilton's letter recommending that plaintiff be placed on permanent staff.

10. During her assignment to the International Paper campaign, plaintiff was also assigned to continue her work at Falcon Products and Klipsch, where she assisted representative Ed Fortson. The International Paper campaign had been in progress when plaintiff was assigned there, and four previously assigned representatives in prior years had been unsuccessful in bringing that campaign to an election. Other than the International Paper assignment, Earl Hamilton gave the plaintiff all of her assignments.

11. Plaintiff testified that during her employment, Earl Hamilton asked her if she would fool around, and asked her if anyone had told her she had "a cute butt." She also testified that he was always making sexual jokes about different things.

12. On February 8, 1981, UBC General President William Konyha appointed Earl Hamilton Acting Director of the Southern States Organizing Office, effective February 23, 1981.

13. In June, 1981, defendant hired Paul Pinkard, a white male, as an organizer assigned to the Southern States region, to work on organizing campaigns in Arkansas and surrounding southern states along with Ed Fortson and plaintiff.

14. Plaintiff was assigned to travel to Neosha, Missouri, while she was working on the Color Tile campaign in Melbourne, Arkansas. She was told to go and work on the Lazy-Boy campaign with others, to help them out. However, when she arrived, she was asked to go to a picnic the company was having to "go and see what you can find out, see if there's any kind of company things that you can come back and tell us, if they are hiding anything." Plaintiff went to the picnic with another gentleman designated by Jake Stewart. The gentleman was a member of the in plant committee. When the gentleman plaintiff accompanied to the picnic became drunk, plaintiff rode back with some other people and was thereafter told by Jake Stewart that "We're through with you." Although defendant denies plaintiff was sent there only for a date, the facts clearly indicate that the assignment turned out to be just that.

15. On January 8, 1982, one year after plaintiff's hire, Regional Director Hamilton wrote to James Parker recommending that plaintiff be assigned to the UBC staff as a regular staff member. In the letter, Hamilton continues to adhere to what he characterizes as an outstanding reference. Furthermore, at a convention in Chicago, attended by plaintiff, Fortson, and Hamilton, Hamilton told Ed Fortson and plaintiff that they were doing real good work and had several wins. At a training seminar held in Houston in January, 1982, Hamilton told plaintiff she was "super-doing a good job." When Hamilton was asked by plaintiff why he had put the "Fame" campaign in Paul Pinkard's name instead of plaintiff's name, Hamilton told plaintiff she didn't have anything to worry about—"you're a woman."

16. Although there is conflicting evidence as to what plaintiff was told when her probationary status was extended in the spring of 1982, the Court finds that the defendant's account cannot be credited. Defendant contends that plaintiff was told that her probation was extended to allow her an additional opportunity to demonstrate her ability to independently develop a campaign to a successful conclusion. Plaintiff contends, which is supported by testimony of Ed Fortson who was present during some of the conversations, that she was never given a negative appraisal, or was advised that her work performance was inadequate, but was merely told it was due to the economy. There is no dispute as to the fact that nothing other than a glowing letter of recommendation exists with respect to a written evaluation of plaintiff's

performance. The Court accepts the testimony of plaintiff and Ed Fortson.

17. During the course of her employment, plaintiff was transferred from one organizing assignment to the next in rapid succession without adequate time to devote to any of the organizing campaigns. During 1981, plaintiff was involved in two out of six successful elections. According to Earl Hamilton, there were some representatives who never got to an election. During 1982, although plaintiff was assigned the Mid-South Cabinet campaign in Conway on her own, she was unsuccessful. However, in that instance, the people plaintiff recruited to help her were fired. Even the defendant acknowledges that when this happens, reaching a successful election becomes difficult. Another campaign plaintiff was assigned to on her own was Mid-South Manufacturing in Marked Tree. However, when plaintiff was directed to leave the campaign to assist in others, there was no one there to continue the campaign, unlike campaigns conducted by Ed Fortson. At no time did plaintiff have the option of exercising her own initiative to pick a place to go or how long to stay. At no time did Earl Hamilton tell plaintiff she was doing something wrong by not going back to Conway to capitalize on the charges that were filed.

18. Plaintiff was notified by letter on June 1, 1982, that she was to be terminated effective June 26, 1982, due to a lack of work. Plaintiff had spoken to Director Hamilton on the telephone and had learned of her termination prior to receipt of the letter. Director Hamilton told plaintiff that economic conditions forced them to layoff plaintiff. After plaintiff's termination, she never received any written explanation of the basis for her discharge, although she subsequently made inquiries. The plaintiff's performance in 1982, after the letter of recommendation was written, did not differ greatly from her performance in 1981, which resulted in a letter as well as words of praise. When plaintiff inquired whether she might be recalled in the future, Director Hamilton told her he did not know. The Court is aware that the defendant testified that there is no probationary organizer who failed to organize a member during 1981 who remains on the staff. However, the court finds that plaintiff was never given any reason other than that the economic conditions in the region for her layoff, and that the defendant has supplied shifting reasons for the plaintiff's layoff.

19. Paul Pinkard, who had been hired after plaintiff to work in the same region, and who had been classified as a "temporary" organizer, was retained after plaintiff's termination and he continued to work in Arkansas until he was transferred to Tennessee in March, 1982.

20. Earl Hamilton, the Southern Regional Director, obtained knowledge of the organizer's activities through the weekly reports, visits to campaign sites and telephone conversations with the organizer.

21. Although no written evidence was presented setting out the way an organizer can generate members, James Parker testified that the primary method an organizer can generate members would be through the process of organizing a unit of employees and filing a petition and obtaining certification, which would eventually culminate into membership if the election were successful. Even the defendant indicated that probationary employees need to be told if they are doing something right or wrong.

22. Although Earl Hamilton testified that he did not include a negative appraisal of plaintiff's organizing ability in her termination letter in order to facilitate her ability to obtain unemployment benefits and subsequent employment, the Court does not find this testimony to be credible in light of the facts and circumstances and contradictory testimony presented in the case.

23. During the relevant time period in which defendant's actions occurred, defendant employed only two female organizers and 39 male organizers on its staff.

### CONCLUSIONS OF LAW

1. The Court has jurisdiction of the subject matter and the parties to this action pursuant to 42 U.S.C. § 2000e, *et seq.*

■ 2. In a disparate treatment case, "proof of discriminatory motive is critical." *Kirby v. Colony Furniture*, 613 F.2d 696, 702 (8th Cir.1980). However, willfulness on the part of the employer is not a prerequisite. *Kober v. Westinghouse Electric Corp.*, 480 F.2d 240 (3rd Cir.1973). In *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335, n. 15, 97 S.Ct. 1843, 1854, n. 15, 52 L.Ed.2d 396 (1977) the Supreme Court states:

"Disparate treatment" such as is alleged in the present case is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although in some situations it can be inferred from the mere ·fact of differences in treatment ... Undoubtedly, disparate treatment was the most obvious evil Congress had in mind when it enacted Title VII.

■ In the present case, the plaintiff has clearly established a prima facie case of sex discrimination. In order to establish a prima facie case, plaintiff must establish that: (1) she belonged to the protected group of employees: (2) she was capable of performing the job; (3) she was discharged from the job. *Johnson v. Bunny Bread Co.*, 646 F.2d 1250 (8th Cir.1981). Plaintiff has met her burden under the above standard. She is a member of a protected class, e.g. females; the evidence shows that she was capable of performing the job; and, in spite of her past commendable performance, she was terminated, for "lack of work", and defendant continued to employ a "temporary" organizer, with less experience than plaintiff, i.e. Paul Pinkard, and placed him on the permanent payroll. Although defendant states that plaintiff did not present any evidence that defendant failed to terminate a male organizer whose performance produced the same lack of results, the plaintiff did provide sufficient evidence indicating that her treatment with respect to her assignments, did not enable her to successfully initiate and conduct a campaign. The Court cannot speculate as to whether those male organizers who were terminated were treated the same as plaintiff. However, the Court does conclude that the evidence presented by the plaintiff indicates that plaintiff was not provided the same opportunities to conduct successful campaigns as was Paul Pinkard, and this was not sufficiently rebutted by the defendant.

Once the plaintiff establishes a prima facie case, the burden shifts to the defendant to rebut it by articulating some legitimate, non-discriminatory reason for the discharge. *See Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). Articulating some legitimate, non-discriminatory business reason only requires an employer to present admissible evidence sufficient to raise a genuine factual issue as to whether plaintiff was discriminated against. *Johnson v. Bunny Bread Co.*, *supra*, 646 F.2d at 1254. The defendant argues that plaintiff did not have a successful campaign which she handled on her own. The burden then shifts to the plaintiff to show that the proffered reason is pretextual and not the true reason for the decision. *Burdine, supra*, 450 U.S. at 252–56, 101 S.Ct. at 1093–95. The Court finds that the reasons asserted by the defendant for terminating plaintiff are pretextual. The Eighth Circuit has held that when an evaluation is in any degree subjective and when the evaluators themselves are not members of the protected minority, the legitimacy and non-discriminatory basis or the articulated reasons for the decision should be subject to particularly close scrutiny by the trial judge. *Paxton v. Union National Bank*, 688 F.2d 552, 563, n. 15 (8th Cir.1982), *cert. denied*, 460 U.S. 1083, 103 S.Ct. 1772, 76 L.Ed.2d 345 (1983).

The record in the instant case reflects that the defendant altered its reasons for terminating plaintiff. Both reasons were patently pretextual. Plaintiff's letter of termination cites economic conditions as the reason for her layoff. There was no reference, direct or indirect, to her inability to perform her job as a basis for termina-

tion, either in writing or by oral communication to the plaintiff.

The chief defense asserted by the defendant at trial was plaintiff's failure to *initiate* and successfully conduct a campaign on her own. However, during the trial, defendant again shifted to a "depressed economy" as the basis for its termination of plaintiff. Furthermore, plaintiff worked on those campaigns which she was assigned to, and was not able to independently initiate a campaign on her own.

The evidence advanced by the defendant in support of either position is deficient and supports a finding of pretext. Plaintiff had been praised by Director Hamilton for her aggressive, enthusiastic approach on January 8, 1982. Any inadequacies in her performance were never documented in plaintiffs' file. Plaintiff was never advised of a need to improve her performance prior to her termination.

> As stated by the Supreme Court, the plaintiff may succeed in proving intentional discrimination by "either directly persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.

*Gardner v. Buffalo Rock Co.,* 527 F.Supp. 505, 509 (N.D.Ala.1981), citing *Burdine, supra,* 450 U.S. at 256, 101 S.Ct. at 1095.

The defendant has failed to rebut successfully the presumption of unlawful discrimination by articulating a legitimate nondiscriminatory reason for its discharge of the plaintiff.

Based upon the foregoing, the Court hereby awards back pay and reinstatement, plus attorney's fees and costs. Plaintiff's attorneys shall submit their fee request to the defendant's attorneys within fourteen days of receipt of this Order. The Court encourages the attorneys to reach an agreement on the amount of the fees and costs. If an agreement cannot be reached, then plaintiff's attorneys shall submit their request to the Court by affidavit no later than August 1, 1984, and the defendant may respond within seven days thereafter.